**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ABEL MESA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | Civil Action No.  SA-17-CV-654-XR |
| v. | § | |
| | § | |
| THE CITY OF SAN ANTONIO, ACTING | § | |
| BY AND THROUGH ITS AGENT, CITY | § | |
| PUBLIC SERVICE BOARD D/B/A CPS | § | |
| ENERGY, | § | |
| | § | |
| *Defendant*. | § | |

## ORDER

On this date, the Court considered Defendant CPS Energy's Motion for Summary Judgment (docket no. 41) and the corresponding Response[1] (docket no. 43) and Reply. After careful consideration, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The live Complaint is Plaintiff's Second Amended Complaint. Docket no. 29. Therein, Plaintiff Abel Mesa sues his former employer, CPS Energy, alleging a number of employment discrimination and retaliation claims. Defendant moves for summary judgment on all claims. As discussed below, Plaintiff concedes several of his claims, but continues to maintain claims for disability discrimination under the "regarded as" prong of the Americans with Disabilities Act ("ADA"), disability discrimination under the ADA based on association with his disabled wife,

---

[1] The Court cites to Plaintiff's exhibits as docket no. 43-1 at [the ECF page number]. The Court notes that Plaintiff's Response includes 40 exhibits that span 241 pages, which are filed electronically as one document rather than as separate exhibits, and without an index, making it difficult for the Court to utilize the appendix of exhibits efficiently. In addition, most of Plaintiff's deposition exhibits lack deposition page numbers, making it difficult to locate cited deposition testimony and to tell whether pages are sequential or whether there are omitted pages in between. Plaintiff is advised not to file appendices with these deficiencies in the future.

retaliation under the Family and Medical Leave Act ("FMLA"), and age discrimination under the Age Discrimination in Employment Act ("ADEA").

Mesa was hired by CPS Energy in 1990 and remained employed by CPS Energy until his alleged involuntary retirement in 2016. In February 2013, Mesa's wife was diagnosed with pancreatic cancer, and Mesa utilized intermittent leave under the FMLA through September 2016 to care for her. Mesa testified that no one ever said anything to him "that they were concerned or bothered by her treatment expenses" or his use of FMLA leave, and he never felt he was being treated differently because his wife had cancer before the events in 2016 leading to this lawsuit. Mesa depo. at 47, 63, 70-71, 77-78.

In 2016, Mesa worked as a control room operator at the Milton B. Lee West power plant, also known as the Leon Creek power plant. A control room operator operates the power plant. Urrutia depo. at 31. Mesa's direct supervisor was Vernon King; his Level 2 manager was Kevin Drennan, an operations manager stationed at the Braunig power plant; and his ultimate manager was Rick Urrutia, CPS Energy's Interim Senior Director over four power plants, including Leon Creek.

Drennan testified that Mesa talked several times about retiring at the end of 2016, "once he made his years of service." Drennan depo. at 6. Mesa testified that in 2016 he sought information about his retirement benefits. Mesa depo. at 89. On August 30, 2016, Mesa and his wife visited with CPS Energy's Employee Benefits department to obtain an estimate of his potential pension benefits upon retirement. Docket no. 41-2 ¶ 5; Mesa depo. at 97. Mesa filled out a Pension Estimate Request with estimated retirement dates of December 1, 2016, February 1, 2017, and August 1, 2017. Docket no. 41-5. December 1, 2016 was the date on which he would have sufficient years of service to retire with full benefits. Docket no. 41-2 (Zinsmeyer

Decl.) ¶¶ 5-6. Mesa testified that the HR employee he met with was unable to answer all of his questions about taxes and insurance and different payment options. Mesa depo. at 93.

On September 9, 2016, Plaintiff emailed Drennan of his intent to retire. His email states, "I plan on retiring. Need to talk to my Broker about Best Option for Me. Analyst could not answer all my questions." Docket no. 41-7. Mesa testified that he sent this email because Drennan "was pushing the issue for me to retire" and "this was my way of kind of like slowing down the process so I wouldn't have to – That's the way I felt at the time to answer." Mesa depo. at 101. However, Mesa then stated that Drennan was not pushing, that he only had one conversation with Drennan about whether he was planning to retire, and that he sent this email on his own. *Id.* at 101-02.[2]

Mesa's Response to the Motion for Summary Judgment states that this email was sent to Drennan "as requested," but Mesa's deposition testimony is clear that no one "requested" that he send this email. Mesa and Drennan agree that they discussed how Mesa could see his retirement numbers, but the specifics of the conversation differ. Mesa testified that Drennan told him to send the intent to retire and told him what to say in order to see his numbers. Mesa depo. at 48. Mesa said that Drennan told him, "Put this the way it is and send it to that Mr. Robinson and he'll show you the numbers and he can pull your -- your papers. This don't mean that you're going to retire. This is just to see your numbers." Mesa depo. at 48. Mesa testified that Drennan told him he could later tell them, after getting his estimates, that he did not want to retire and that they would "pull his papers," and that this was a normal procedure. Mesa depo. at 138. Drennan testified that Mesa had said he wanted more information about what his numbers would look like, so he shared with him that he had used the online tool to get calculations, and never

[2] Mesa's testimony about when this conversation occurred is confusing. He ultimately stated that Drennan asked him if he was going to retire "right there pretty close at the end," meaning near the end of his employment in late 2016. Mesa depo. at 95.

suggested that he should send him an intent to retire to find out more information. Drennan depo. at 7. Mesa testified that he was aware of and had used the online tool, but it did not provide enough information about insurance and "take home" pay. Mesa depo. at 80, 90, 97. Thus, the evidence does not show that Drennan requested the email, but the evidence raises a fact issue as to whether Drennan suggested that Mesa send the email (and how to word it) in order to see his retirement numbers.

After Mesa emailed Drennan his intent to retire, Drennan responded back thanking him for the notice and asking him to update with the intended retirement date as soon as possible. Docket no. 41-7. Mesa and Drennan had no further conversations about Mesa retiring, and Mesa did not talk to anyone else in management about retiring. Mesa depo. at 103. Mesa testified that he did not ask for any more numbers to be run by the pension department because he "wasn't interested in retiring" and the numbers would be good for another year. *Id.* Mesa testified that he did not meet with his broker. *Id.* at 104.

On Monday, September 12, 2016, Plaintiff was on a ladder at work and had his left arm raised when he felt extreme pain in his left shoulder. He was afraid to get down and asked a co-worker to call EMS; he was taken to the emergency room by ambulance. Mesa depo. at 104-06. The emergency room physician took x-rays and gave him pain medication, diagnosed him with a shoulder sprain, and released him the same day with instructions to follow up with a private physician in one to two days for "Further diagnostic work-up, Recheck today's complaints, Continuance of care." Mesa depo. at 106-07; docket no. 41-9; docket no. 43-1 at 65 (Ex. 7).

A worker's compensation claim was opened with Broadspire, CPS Energy's third-party workers' compensation administrator. Docket no. 43-1 (Ex. 8). The next day, Tuesday September 13, Mesa was evaluated at Texas MedClinic on Bandera Road. This appointment was

facilitated by Jose Castaneda, the Safety and Health Program Manager at CPS, to ensure further care in accordance with workers' compensation regulations. Castaneda depo. at 11-12. The MedClinic records indicate that Mesa was diagnosed with a left shoulder strain and prescribed ice, range-of-motion exercises, and "ibuprofen during the day, tramadol as needed at bedtime with two Tylenol." They also state, "May need physical therapy if not progressing." Docket no. 43-1 at 72.

Texas MedClinic provided a Texas Workers' Compensation Work Status Report, which released Mesa to return to work with certain restrictions expected to last through September 16, including: no climbing stairs or ladders, no reaching, no overhead reaching, no lifting or carrying, and automatic transmission driving only. Docket no. 41-10. A follow-up evaluation was scheduled for 10:30 a.m. on Friday, September 16. *Id.* Castaneda stated that receipt of this information started the ADA process, that the next step was to identify whether the business area could accommodate Mesa based on the restrictions outlined by the treating physician, and that this was handled by human resources. Castaneda depo. at 12.

Lisa Jarzombek in CPS's Absence Management Department received the Texas MedClinic evaluation in the afternoon of September 13 and emailed Drennan, Vernon King, and Toni Harris-Rowland in Human Resources stating that Mesa needed light duty accommodation "effective 9/13/16 through 9/16/16" with a follow-up appointment scheduled for September 16. Docket no. 41-11. The email asked "HR/Mgmt" to "please make the necessary accommodations and forward the signed BFOE [bona fide offer letter for a light duty assignment] to the Leave [Department] in box once completed." *Id.*

On or about September 14, Mesa was contacted by doctors in Houston who were treating his wife's cancer, and they instructed him that his wife needed an infusion in Houston on Friday,

September 16. Mesa depo. at 117. Mesa contacted the Texas MedClinic on September 14 to reschedule his September 16 follow-up appointment. Docket no. 43 at 77 (Ex. 11). Documents indicate that on the 15th at 11:05 a.m., Broadspire (the third-party workers' compensation administrator) received a notice stating that Mesa called on September 14 to reschedule the appointment "due to him going out of town" and that the rescheduled appointment was set for September 23 at noon. Docket no. 43-1 at 77 (Ex. 11). Plaintiff's brief asserts that this was sent by fax to Jarzombek, but the information at the bottom of the page states "BroadSpire Receive date - 9/15/2016." The notice includes information about Mesa's employer and contact information (phone and fax) for Jarzombek, but does not indicate that it was faxed to her. It appears that Jarzombek was aware that Mesa had rescheduled the appointment, but not why, by the morning of the 15th. Docket no. 43-1 at 81.[3]

On Thursday, September 15 at 9:44 a.m., Toni Harris-Rowland from HR emailed Lisa Jarzombek in the Leave Department asking for Mesa's contact number, which Jarzombek then provided. Docket no. 41-11. At 9:56 a.m., Harris-Rowland emailed Drennan, Jarzombek, and Urrutia stating, "I spoke with Abel [Mesa] he will report to Ron at Braunig [power plant] tomorrow at 6:30 am. I will send a meeting invite with the bona fide offer letter and accommodation checklist for us to review with the employee and obtain signatures." *Id.* Harris-Rowland testified that she had the phone conversation with Mesa "[s]ometime prior to sending the e-mail usually right after I speak to the employee." Docket no. 43-1 at 144. Jarzombek responded at 10:30 a.m. and asked if Mesa had mentioned anything about why he rescheduled

---

[3] Castaneda testified that, at an unspecified time, he received a notice via email that Mesa had missed the MedClinic appointment. Castaneda depo. at 13. The Texas MedClinic notice is titled "Missed/Rescheduled Appointment" and it may have been this notice. Castaneda stated that he followed up with human resources to see if they had talked to Mesa but could not recall with whom he spoke, and that he did not follow up further on why Mesa "missed" the appointment because that would fall under HR. *Id.* He did state that he had a conversation, he thought with human resources, that Mesa had to go out of town, but he could not recall the circumstances. *Id.* at 14.

his appointment, and Harris-Rowland responded only that he had asked for the fax number. Docket no. 43-1 at 81. At 4:17 p.m., Jarzombek sent an email (recipients unknown) stating, "I received a call from the adjuster at Broadspire. Abel Mesa will be returning to work tomorrow to sign his BFOE." Docket no. 41-12.

At some time on the 15th, Mesa requested FMLA leave for Friday September 16 and Monday September 19 and it was approved, but fact issues exist as to when CPS Energy became aware of it. It appears that Drennan, Harris-Rowland, and others still expected Mesa to report for work at the Braunig plant at 6:30 a.m. for light duty. Records show that Reed Group, the FMLA administrator, informed CPS Energy by letter directed to Vernon King dated September 15 that Mesa requested FMLA leave and was approved for time off on the 16th and 19th. Docket no. 43-1 at 80 (Ex. 12), at 81 (Ex. 13). However, it is not specified when, how, or to whom this letter was actually transmitted. Harris-Rowland testified that "[t]he normal process is for them to come through the workflow." Docket no. 43-1 at 146.

Mesa testified that at some unspecified time, which he appears to believe was on the 15th, Harris-Rowland called him and made a comment to him that he "moved [his] appointment to go to Houston to have fun." Mesa depo. at 73.[4] Mesa testified that he explained to her that he was going to Houston for his wife's appointment. Mesa also testified that Harris-Rowland was upset because she wanted him to go to the Braunig plant on light duty work, and he had "over writ" what she wanted him to do. *Id.* at 74. He testified that Harris-Rowland told him he was "bona fiding [her] offer," meaning that he "was not going to take" what she was offering, but that he had not been aware of the offer. *Id.* at 73-74, 77. Mesa also testified, "And that's where I had already had it with FMLA that I could go. And Vernon [King] had approved it to go so –

---

[4] Mesa could not say for sure whether he had one or two telephone conversations with Harris-Rowland. Mesa depo. at 122. When asked about conversations on the 15th, he recalled that a conversation was later in the day, while Harris-Rowland's testimony indicates there was a conversation that morning.

And I told her – I told Vernon. Vernon was upset because – And he told me – Vernon told me: Abel, you go take care of your wife." Mesa depo. at 73-74.

At 7:35 a.m. on Friday the 16th, Harris-Rowland sent an email stating that Mesa did not report to work and did not return calls from his supervisor and asked "what is his status?" Docket no. 43-1 at 92 (Ex. 15). Harris-Rowland sent an email at 8:51 a.m. stating, "Abel called me at 8:20 a.m. to tell me he called his manager this morning and Reed yesterday and his manager this morning [sic] to let them know he would not be reporting to work today. Abel advised me yesterday that he was not going to report because he did not feel well and he was going to the doctor's to get a new FFD."[5] *Id.* At 9:19 a.m., Drennan emailed Harris-Rowland, Jarzombek, Veronica Wycoff, Interim Human Resources Manager, and others to say that he called Mesa that morning because he did not report to Braunig for light duty work as expected and that Mesa told him that he had contacted Reed Group for FMLA leave that day and Monday, and Drennan told Mesa to contact Harris-Rowland and provide this update.[6] Docket no. 43-1 at 91 (Ex. 15).

At 9:39 a.m., Wycoff responded that "[w]hen employees are reporting absences (since he was expected to return today), the expectation is that they contact their supervisor to report and follow the reporting expectations, per the Attendance Guidelines," and "[i]f they are requesting FML, their second call would be to Reed Group." *Id.* Wycoff asked the leave team to keep her posted if they were aware of an FMLA request. *Id.* At 10:58 a.m., the Leave Department responded, stating, "Yesterday evening, Reed Group processed Mr. Mesa's request for

---

[5] This email is included within the body of another email and is cropped so that it appears to be from Harris-Rowland, and Harris-Rowland testified at her deposition, "That's what he told me and that's what I reported." Docket no. 43-1 at 144. Mesa denied ever telling anyone that he would not be reporting to work because he did not feel well. Mesa depo. at 124.

[6] At 9:21, Drennan sent an email (recipients unclear) asking "Has Abel Mesa contacted you to provide an update on returning to work or not returning to work?" Docket no. 41-14. Ronaldo Gutierrez responded (Vernon King and Fred Roseland are copied), "He has not contacted me." *Id.* Vernon King sent an email at 6:50 p.m. stating that at 4:32, Mesa "let me know he was on way back from Houston with his wife today. He said that they had another appointment in Houston Monday morning 9/19/16." *Id.*

intermittent time off for dates 9/16/16 and 09/19/16. Both requests have been approved." Wycoff responded "please follow up with Abel upon his return if he did not timely report his absence to his supervisor." *Id.*

On September 19, Jarzombek emailed Harris-Rowland, Drennan, and others stating that she just "received a call from the workers' compensation adjuster on Abel Mesa" and that "he told her he will be reporting to work tomorrow, 9/20/2016" and would be contacting HR or his supervisor about what time to report. Docket no. 41-12; docket no. 43-1 at 89. Drennan asked if Mesa was released for full duty or still needed the light duty accommodation, and Jarzombek responded, "The assumption is for the light duty accommodation. He was told his work status has expired and he will be going to a different clinic that he will be making an appointment with this week." *Id.* Drennan responded at 1:30 p.m., "I'm not sure about the work status expiring, however if he is on light duty he will report to [Braunig], if released for full duty he will report to [Leon Green]." *Id.* A short while later, Harris-Rowland responded to Jarzombek's email (which included Wycoff, the Leave Department, Drennan, Kipling Giles, and Ronaldo Gutierrez) stating, "What is he [sic] time code for today since he refused to report on Friday for the Bona Fide Offer." Docket no. 43-1 at 89.

Mesa testified that Broadspire, CPS Energy's third party worker's compensation administrator, set up a follow-up appointment at 8 a.m. on September 20 at Nova Clinic. Mesa depo. at 150. Nova Clinic gave Plaintiff a full duty work release that same day, which noted that it was the last scheduled visit for the problem and that no further medical care was anticipated. Docket no. 41-15. Broadspire's documentation dated September 20 states, "there is no medical management exposure as employee was released to full duty and from doctor's care on

"09/20/16" and includes the action plan "close file if no further treatment required since 09/20/16. 10/2016" and the goal "closure by 10/2016." Docket no. 43-1 at 97.

Mesa returned to work on September 20 and gave his full duty work release form to King. Castaneda testified that he received notice of the release and found it had been approved. Castaneda depo. at 15. In response to an inquiry from Jarzombek, Drennan stated that Mesa "has a full release to give his SS at MBLW [Leon Green] today." Docket no. 41-16. Jarzombek asked to be a given a copy once it was received, and at 4:39 that afternoon sent an email to Drennan, King, Harris-Rowland, and the Occupational Health and Leave departments, stating it had been received and that "[h]e has a full duty release for 9/20/16 and no further medical is anticipated." Docket no. 41-16.

Also in the afternoon on September 20, Mesa emailed Drennan (copying Kelly Robinson, a Benefits Analyst in CPS Energy's Employee Benefits Department) with the subject "Retirement," stating, "My Intent to retire is December 1, 2016." Docket no. 41-8; docket no. 41-2 ¶ 8. Drennan responded, "Message received," and copied Urrutia as well as Patricia Villa, the interim manager over the Leon Creek and Braunig Power Plants. Mesa testified that he sent this in order to receive all of his benefits information and that Drennan had told him what to say. Mesa depo. at 48. Defendant has submitted evidence that employees are not required to submit an intent to retire to obtain pension estimates. Docket no. 41-2 ¶¶ 4, 7.

In the afternoon on September 21, Drennan forwarded Jarzombek's email about the full duty release (and a copy of the release) to Urrutia, stating "This is what we received yesterday." Docket no. 41-16. At some point, there was a meeting or discussion involving the chief safety and security officer, Fred Bonewell, and "leadership from Power Generation" (Castaneda believed it was Urrutia, and Urrutia recalled a conversation) to discuss concerns "about

conflicting reports from the two different facilities that Mr. Mesa had sought medical care [from]." Castaneda depo. at 16-17; Urrutia depo. at 47. Castaneda thought it was Urrutia who had these concerns. Castaneda depo. at 17. Urrutia testified that "this employee is in a heavy industrial environment, sometimes has to work alone so we have to make sure that our employees are fit for the duty." Docket no. 43-1 at 112.

Castaneda noted that the Texas MedClinic report stated that Mesa sustained injuries that required restrictions that were very specific, in addition to prescription medications, and then the Nova Clinic report said that he was clear to return to work full duty with no restrictions, and there were concerns about what Mesa's abilities were, to make sure he could do the job. Castaneda depo. at 17. Castaneda testified that "there was concern about his well-being, considering he had significant restrictions in the previous appointment, and now he had no restrictions." *Id.* at 25. There were discussions about Mesa undergoing an MRI[7] and there were discussions about him undergoing additional testing through a human performance evaluation (a fitness for duty exam). *Id.* at 23-35. Castaneda stated that it was a consensus and it was his recommendation that Mesa have the human performance evaluation. *Id.* at 17-18.

On the 21st, Mesa worked a partial shift, but was then escorted off the job by King and had his badge taken away. Mesa depo. at 158. Mesa was told "something was wrong with the paperwork" and that he would be on paid administrative leave until he heard from Drennan.

---

[7] Plaintiff has provided an undated email from Fred Bonewell, Chief Safety and Security Officer, stating, "The gentleman from Leon Creek accident last week is still pending on a couple of factors: 1.) He missed an appointment last week to leave out of town. This has been reported to the carrier. 2.) The physician has ordered an MRI to fully understand what is going on inside the shoulder joint. This may take a while to rectify since he's out of town. Will keep you in the loop." Docket no. 143-1 at 171. It appears undisputed that no physician ordered an MRI, and that Bonewell was mistaken. Castaneda testified that, during the meeting after Mesa's return, there were questions as to whether Mesa could get an MRI to make sure he had no issues with the injury, but because the workers' compensation case was closed, there was no justification in accordance with the workers' compensation regulations to seek additional diagnostic treatments. Castaneda could not recall who suggested an MRI, but he testified that "there were questions as to whether he could get an MRI" and when asked who wanted him to get an MRI, he answered "I believe it was a consensus to make sure he had no issues with the current injury he had sustained." Castaneda depo. at 23-24.

Mesa depo. at 158. Urrutia testified that "we had him leave work because he wasn't cleared for work by CPS Energy." Urrutia depo. at 33. Urrutia testified that he spoke with Harris-Rowland, and then instructed the team at Leon Creek to have Mesa go home because he was not cleared for work. Urrutia depo. at 33.[8] Urrutia testified that clearing employees to return to work was a "joint effort between the business unit, HR, safety, in some cases, legal and upper management" and the "occupation health [department] would, you know, schedule a fitness for duty to determine if the employee is fit to return to work." Urrutia depo. at 34-35. Drennan testified that when employees were out because they were not cleared to return to work, their badges were not normally taken away. Drennan depo. at 13.

Mesa was then off his regular days the next two days and scheduled to work the 24th through the 27th, but he testified that he did not hear from anyone on those days. Mesa depo. at 160. He called Drennan on September 28, and Drennan said someone would notify him. *Id.* Urrutia testified that there was such a long gap because they were "trying to understand the status of the employee's return to work status" because they did not get follow-up information from the MedClinic follow-up appointment and they were trying to understand why Mesa did not go to the scheduled appointment on the 16th, why he did not go back to the original doctor, the reports were inconsistent, and it "took us time to determine what – what do we need to do to understand the employee's fitness for duty to ensure that he's safe and nothing happens to him and it took eight days to do that." Urrutia depo. at 37. Urrutia stated that the concern was not where Mesa was on the 16th, but the inconsistent reports from different evaluators. Urrutia depo. at 42-43.

[8] Mesa's Response states that Urrutia called and spoke with Harris-Rowland to discuss Mesa before telling Drennan that Mesa was not cleared to return and then states, "However, in her testimony, Harris-Rowland denied ever telling Urrutia that he needed to take Mesa off the job, or that there were any issues with Mesa's medical paperwork." But this testimony is not inconsistent, as Urrutia testified that he did not recall exactly the sequence of what he did and that he "would say yes" he spoke with Harris-Rowland but he did not know exactly what she told him to do and he did not "recall anybody telling [him] that [Mesa] received a full-duty release form." Urrutia depo. at 33.

Castaneda filed an affidavit stating that Mesa had provided two conflicting medical releases – one with restrictions that had not been lifted due to his failure to attend a follow-up appointment (MedClinic) and one without any restrictions at all (Nova). Docket no. 41-29.

On September 28, Castaneda called Mesa about scheduling a human performance (fitness for duty) evaluation. Castaneda depo. at 18. Castaneda testified that Mesa informed him that he would be going the next morning. He testified that he did not give Mesa options on when to go, that "[i]t was specific to the next morning," and that Mesa "said he was going to be available to go." *Id.* at 18-19. Castaneda stated that there was no set appointment time and that it was a walk-in appointment, but Mesa "was given specific instructions to go on this specific date because of the authorization to treat." Castaneda depo. at 21. Castaneda's affidavit states that, when he completes an authorization for an employee to attend a fitness for duty exam, the authorization is only for the specific date listed. Docket no. 41-29. Castaneda emailed Harris-Rowland and Urrutia on the morning of the 28th and said, "I was able to get a hold of Mr. Mesa and he will be going tomorrow morning to undergo his fitness for duty physical." Docket no. 41-19.

However, Mesa testified that Castaneda told him he could go on Thursday the 29th or Friday the 30th, and that he chose to go Friday. Mesa depo. at 166, 171. He did not recall Castaneda saying he would see him at Concentra on the 29th. *Id.* at 166. On September 29, Castaneda went to Concentra and waited for a couple of hours to see if Castaneda had any questions or concerns, but Castaneda did not appear. Castaneda depo. at 19. Castaneda texted Mesa on his personal cell phone that afternoon to see if he had gone to Concentra, but Mesa testified that he did not see the text until the next day because he "[doesn't] ever carry a cell phone." Mesa depo. at 170.

CPS Energy conducted a conference call that evening about Mesa. Castaneda depo. at 20; Urrutia depo. at 48-51. Defendant's evidence indicates that this call had been previously scheduled among Castaneda, HR representatives, and Mesa's senior leadership team to discuss the results of Mesa's fitness-for-duty-exam. During the call, Castaneda informed the others that Mesa had not appeared for the exam. Castaneda testified that there was a "question as to why he didn't show up" and the participants "had concerns about [Mesa's] well-being." Castaneda depo. at 20. Castaneda testified that a decision was made during the call to place Mesa on unpaid leave until his December 1 retirement date. Urrutia was unsure when the actual decision was reached, but agreed it was made by September 30. Urrutia depo. at 56. Urrutia testified that Mesa's past disciplinary and work history were not discussed, and different disciplinary options were not discussed. Urrutia depo. at 50-51, 58-59. There was no discussion about rescheduling the human performance evaluation. Castaneda depo. at 21; Urrutia depo. at 53.

Castaneda testified, "We did discuss what next steps would be taken as far as getting him to his retirement dates." Castaneda depo. at 20. He further testified, "At that point, he was on administrative leave. And I think they were trying to get him to the end of the month. Because that's the way the retirement process works, you go to the end of the month. And then day one of the following month is the retirement day." *Id.* Castaneda said the decision was to have Castaneda remain on leave, but he did not recall who made the decision. Castaneda depo. at 22.

Urrutia testified that the decision was based on "the fact that Mr. Mesa did not show up to his assigned fitness for duty assigned by occupational health, the fact that we're concerned about the safety of the employee, you know, he did submit his retirement, intent to retire on the 20th, so instead of corrective action process we decided to put him on unpaid leave and not interrupt his end – employment until his retirement date that he – he requested." Urrutia depo. at 59. The

safety concern was "[w]e did not know the fitness of the employee for duty." *Id.* at 60. Urrutia also stated, "We were trying to get him back to work, but, first, we had to understand his fitness for duty." Docket no. 43-1 at 117 (Urrutia depo.).

Urrutia also testified, "Mesa because he submitted his retirement, circumstances we already discussed about, you know, the inconsistencies [between the two medical releases], we decided that, you know, instead of going through the Corrective Action Policy we – we – we take an unpaid leave approach and let the employee retire without any interruption of his employment. That's why we did that." Docket no. 43-1 at 124-25. Urrutia also stated that the unpaid leave was imposed because Mesa "failed to report as requested by the company to get his fitness for duty." Urrutia depo. at 60. Urrutia could not recall what Castaneda had told him about why Mesa did not report. Urrutia depo. at 60. The length of the unpaid leave was based on Mesa's intent to retire date of December 1, 2016. Docket no. 43-1 at 127 (Urrutia depo.).

Harris-Rowland testified that Mesa was placed on unpaid personal leave (not suspended) because "[t]here was concern about his safety and so he was not returned to his business area," though she was unable to provide any specifics, and she later testified that she did know of any reason that Mesa was being placed on unpaid leave other than his failure to report for the human performance evaluation. Docket no. 43-1 at 132, 140. She testified that failure to report for the evaluation could be considered a safety issue or a failure to follow instructions. *Id.* at 140.

Castaneda could not recall who made the decision. Castaneda depo. at 22. Urrutia testified that "power generation (myself), our safety, HR, legal team, and my business unit leader" were involved in the decision to put Mesa on unpaid leave and "this was the decision that was made by that joint team." Urrutia depo. at 57-58. Harris-Rowland testified that Urrutia was not the sole decisionmaker, but she could not give specifics on who else was involved. Docket

no. 43-1 at 138. Lisa Lewis, CPS Energy's Vice President of People and Culture, submitted an affidavit stating that she was also involved in the September 29 decision to place Mesa on unpaid leave and that "he was placed on unpaid leave solely because he failed to attend an examination that was required due to conflicting medical releases received." Docket no. 41-23. She further attested, "Because this was a unique circumstance, particularly with Mr. Mesa's upcoming retirement on December 1, 2016, CPS Energy's corrective action policy did not apply." *Id.* There is no evidence that Drennan participated in the decision.[9]

It is undisputed that the Corrective Action Policy was not applied. The Corrective Action Policy states that its process "will be administered when a problem is not serious enough to warrant immediate termination" and includes formal corrective actions of Reminder 1 (for minor violations or deficiencies), Reminder 2 (for serious violations and deficiencies), Reminder 3 (for major violations and deficiencies that constitute some degree of threat to the operation of the organization or to the safety of employees and includes a one-day unpaid suspension), and Final Warning (appropriate for an additional infraction occurring during the active period of a Reminder 3 and includes a three-day unpaid suspension). Docket no. 43-1 (Ex. 31).[10]

Harris-Rowland prepared a critical issues activity report on September 30, which stated, "Determination to separate employee after he did not report for HPE. A. Mesa sent home on paid

---

[9] CPS Energy's Motion asserts that Drennan was not involved in the decision and cites Drennan's deposition testimony (Ex. 18) at page 16 that Drennan was "only advised of the decision afterwards". Docket no. 41 at 23. However, Exhibit 18 contains only pages 4 through 13 of Drennan's deposition, and thus this testimony is not in the record. Nevertheless, Plaintiff has not rebutted this assertion or offered any evidence that Drennan was involved in the decision. Mesa's brief asserts that Harris-Rowland, Urrutia, Bonewell, Castaneda, and "others" participated in the conference call, citing a meeting roster that does not include Drennan. Docket no. 43 at 8 (citing Plaintiff's Ex. 26). Thus, Plaintiff has not disputed that Drennan was not involved in the decision.

[10] Plaintiff's brief asserts that "Urrutia later admitted that if Mesa had not been about to retire then the corrective action policy should have applied." Docket no. 43 at 11. However, Urrutia's testimony is as follows:

Q. Okay. If Mesa hadn't been about to retire and missed the appointment, would the Corrective Action Policy have been applied to him? MS. REINHARD: Objection only to the extent it calls for speculation.

A. I – I think – I – I can't – Again, that would be speculating on my part. I – we'd have to – it'd be speculating on my part. Our Corrective Action Policy does, you know, mention that – if I remember right, I mean, there is -- . . . – there is mention of this type of occurrence in our policy."

Docket no. 43-1 at 126-27.

leave by R. Urrutia pending MRI however, this cannot be done since WC case is closed. Mesa will be sent for new FFD." Docket no. 43-1 at 169. Harris-Rowland testified that she just reported what Urrutia had told her. Docket no. 43-1 at 135.[11] Castaneda testified that there was never a plan to set up a new HPE after September 29. Docket no. 43-1 at 181. Thus, this appears to summarize that Mesa had previously been sent home on paid leave on September 21 pending an MRI (that the evidence indicates that Castaneda, Urrutia, and Bonewell wanted him to get, but that could not be done under worker's compensation) and that he was then sent for a new fitness-for-duty exam. It then states that a decision was made (at the September 29 meeting) to separate Mesa after he did not report for his human performance evaluation on September 29. Mesa contends that the use of the word "separate" indicates that he was fired.

When Plaintiff arrived at Concentra Clinic on Friday September 30 for the human performance evaluation, he was informed that he would not be attended to because he was supposed to be there Thursday. Mesa depo. at 172. Mesa was directed to call Harris-Rowland and given a phone number. *Id.* at 172-73. Mesa called her immediately and she got "in contact with Rick [Urrutia] and Trish [Villa], and they decided for [Mesa] to meet them on [October 3, 2016.]" Mesa depo. at 173-74. Harris-Rowland also informed Plaintiff that he was supposed to be at Concentra on Thursday, September 29, and Mesa responded that he had been told to go Thursday or Friday and had chosen Friday. *Id.* at 174-75.

---

[11] Mesa contends in his Response that Harris-Rowland testified that Urrutia had requested the MRI and that is why she wrote that on the Critical Issues Report (Harris-Rowland depo. at 22). However, Harris-Rowland's testimony is as follows:
Q. . . . What did you mean by "pending MRI"?
A. I was writing what I had been informed of by Rick.
Q. Okay. So Mr. Urrutia would have told you that the leave was pending MRI?
. . .
A. Yes
Docket no. 43-1 at 136.

At the October 3 meeting, Mesa met with Urrutia, Patricia Villa, and Harris-Rowland. Mesa depo. at 176. Urrutia read the contents of a letter to Mesa. *Id.* at 189; docket no. 41-13. The letter stated that, effective October 3, he would be placed on unpaid personal leave through November 29, 2016, and that the decision was based on his failure to report for the requested human performance evaluation on September 29. Mesa depo. at 189-90. The letter stated that Mesa was required to return his employee badge, keys, phones and other CPS Energy property in his possession, that his "employment relationship will end on November 29, 2016, as requested in your retirement election," and that the "unpaid personal leave will have no impact on any workers' compensation, disability or retirement benefits." Docket no. 41-24.

Mesa testified that he told them what they were doing was not right. Mesa depo. at 181. He testified that he also said, "This is all y'all have to say? . . . None of y'all is going to say nothing?" and "After being there 26 years, missing – missing birthday parties with my kids, missing Thanksgiving with my kids, Christmases with my kids, this is how y'all pay me back for coming to work every day? This is – This is how y'all thank me? That's how the – This is it?" Mesa depo. at 181. He did not tell them he did not want to retire. *Id.* at 191-92. Mesa states that he was not paid and his insurance was dropped during the leave, and that he felt he was fired. Mesa depo. at 190. He also testified that he was forced to retire. *Id.* at 191. He never tried to get his job back because he felt it would be futile. Mesa never filed a grievance under CPS Energy's grievance procedures.

Urrutia testified that Mesa was not separated, but was placed on unpaid leave on October 3 and "employment was completed at his retirement date." Urrutia depo. at 50. He also stated that Mesa was employed by the company but on unpaid leave, and "this was the decision that was made by [the] joint team." Urrutia depo. at 58. Harris-Rowland also testified that Mesa was

never separated during the leave and that it was a determination that he was not returning to the work location. Docket no. 43-1 at 136-37.

Mesa applied for unemployment benefits with the Texas Workforce Commission, stating that he had been fired. Notice was mailed to CPS on October 5, 2016. On October 17, Harris-Rowland told the TWC that Mesa was still employed but was placed on unpaid personal leave until November 29, 2016 and that he would be separated on his December 1 retirement date. Docket no. 43-1 at 160. On October 6, in response to an email discussion about coding Mesa's time, Harris-Rowland wrote, "This is not a suspension." Docket no. 43-1 at 190. She also wrote, "Please make sure that A. Mesa is coded Personal Non-paid as of yesterday, Oct. 3, 2016." Docket no. 43-1 at 191. On October 12, Harris-Rowland sent an email stating, "Abel Mesa was placed on personal unpaid leave on Oct. 3, 2016 through November 29, 2016. It appears the Leave team entered 12 hours of leave for Oct. 10, 2016 because it was a pending FML request for time off (see attached Reed notice). Please make sure that Mr. Mesa does not get paid for any leave for Oct. 10, 2016." Docket no. 43-1 at 192.[12]

On November 4, 2016, Mesa and his spouse met with Robinson to review different retirement options and select the options they wanted. Docket no. 41-2 ¶ 8. During this meeting, Mesa never told Robinson that he did not want to retire or that he wanted to rescind his stated intent to retire. Mesa depo. at 195-197. Mesa and his wife signed all documents necessary to finalize his retirement effective December 1, 2016. Docket no. 41-2 ¶ 8. At no time did Mesa inform the Employee Benefits Department that he did not intend to retire when he sent the September 20 email. Docket no. 41-2 ¶ 8. Mesa testified that he did not communicate that he did

---

[12] Reed Group sent a letter directed to Harris-Rowland dated September 30 stating that Mesa had been approved for FMLA leave on September 16 and September 19, and that he had a pending FMLA request for October 10. Docket no. 43-1 at 166-67 (Ex. 27).

not want to retire because he "didn't think [he] had a leg to stand on" and to him, it was over. Mesa depo. at 197.

In April and May 2017, Plaintiff filed complaints with the Equal Employment Opportunity Commission and the Texas Workforce Commission Civil Rights Division. Plaintiff filed his Complaint with this Court on July 19, 2017, and his Second Amended Complaint on January 9, 2018. Docket no. 1, Docket no. 29. Mesa began working full time for Aldez Containers in October 2017 making $11.50 per hour, when he had been making over $40 per hour at CPS Energy. Mesa depo. at 19.

In his Second Amended Complaint, Plaintiff brings claims for disability discrimination under the Rehabilitation Act of 1973; disability discrimination under the ADA based on (1) his own actual disability, (2) being regarded as disabled, and (3) his association with his disabled wife; age discrimination under the ADEA; and retaliation under the FMLA for taking leave for himself and to care for his wife. Docket no. 29 ¶¶ 34-58. In response to Defendant's motion, Plaintiff concedes his claims under the Rehabilitation Act, under the ADA because of his own disability, and under the FMLA related to leave for his own health condition. Docket no. 43 at 1.

The following claims still remain: (1) disability discrimination in violation of the ADA based on the theory that Defendant regarded Plaintiff as disabled; (2) disability discrimination in violation of the ADA based on the theory that Defendant's adverse actions were motivated by Plaintiff's association with his disabled wife; (3) retaliation in violation of the FMLA for Plaintiff's use of benefits to care for his disabled wife; and (4) age discrimination in violation of the ADEA.

# ANALYSIS

## I.      Summary Judgment Standard

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 853, 860 (5th Cir. 2004). The court "may not make credibility determinations or weigh evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 (2000); *Anderson*, 477 U.S. at 254-55.

## II.      Disability Discrimination under the ADA

Plaintiff asserts two claims under the ADA: (1) that he was discriminated against because Defendant regarded him as disabled and (2) he was discriminated against for associating with his

disabled wife. Defendant contends that Plaintiff cannot satisfy his *prima facie* burden for either claim because he cannot establish that he was "regarded as" disabled and he cannot establish that association with his wife was a motivating factor in his suspension. Docket no. 41 at 11-15. Defendant further contends that, even if Mesa can establish a *prima facie* case, it has provided a legitimate, non-discriminatory reason for the adverse employment action – Mesa's failure to appear for the required fitness for duty exam – and he has no evidence to show that this reason is pretextual because the relevant decisionmakers all believed he had missed the appointment.

A. *Plaintiff's "Regarded as" Disabled Claim*

In order to make out a *prima facie* showing under the *McDonnell Douglas* framework for the claim that he was discriminated against because Defendant regarded him as disabled, Mesa must show that: (1) he was regarded as disabled (as described in 42 U.S.C. § 12102(3)); (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of the perception of disability. *Cannon v. Jacobs Field Servs., N.A. Inc.*, 813 F.3d 586, 590 (5th Cir. 2016); 42 U.S.C. § 12102(1). For purposes of this motion, it is undisputed that Mesa was qualified for the job. Mesa asserts he was subject to two adverse employment actions on account of the perception of disability – a suspension and a termination. Docket no. 43 at 17. Placement on involuntary leave and termination are adverse actions under the ADA regulations. 29 U.S.C. § 1630.2(l). CPS Energy challenges the first element of the *prima facie* case.

(1) transitory and minor defense

CPS Energy first moves for summary judgment on the basis that Mesa was not regarded as disabled as defined in 42 U.S.C. § 12102(3) because his impairment was transitory and minor. The ADA states that the term "disability" means "being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1)(C). Paragraph (3) states that, for purposes

of being regarded as having an impairment, "an individual meets the requirements of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "Physical or mental impairment" means "any physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, etc." 29 C.F.R. § 1630.2(h). This change in the definition of "regarded as" disabled was part of the Americans with Disabilities Amendments Act ("ADAAA") of 2008. Thus, although an actual disability is a physical or mental impairment that substantially limits one or more major life activities, an individual can now be "regarded as" disabled when he is subjected to a prohibited action because of a impairment, whether or not the impairment limits or is perceived to limit a major life activity.

However, paragraph (3) further states, "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B). The statute does not define a "minor" impairment. The regulations and EEOC guidance indicate that "transitory" and "minor" are separate and distinct requirements.

Thus, it is clear that, under the "regarded as" prong, a plaintiff is not required to show that he is substantially limited in a major life activity or that the employer perceived him as being substantially limited in a major life activity. *Cannon*, 813 F.3d at 591-92 (noting that the ADAAA overrules prior authority requiring a plaintiff to show that the employer regarded him or her as being substantially limited in a major life activity); 29 C.F.R. § 1630.2(j)(ix) (whether an individual's impairment substantially limits a major life activity is not relevant to coverage under

the "regarded as" prong). Nevertheless, the ADA also makes clear that the "regarded as" prong "shall not apply to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B). CPS Energy contends that Mesa testified that he fully recovered from his shoulder injury within eight days, meaning his impairment was transitory and minor. Docket no. 41 at 13.

As this Court has previously noted, whether the plaintiff must prove that the impairment was not transitory and minor, or whether the transitory and minor nature of the impairment is a defense, is not entirely clear from the statutory language. *Dube v. Tex. Health & Human Servs*, No. SA-11-CV-354-XR, 2011 WL 4017959, at *2 (W.D. Tex. Sept. 8, 2011) ("[T]he ADA is somewhat ambiguous regarding the burden of proof on the issue of whether an impairment is transitory and minor."). However, the regulations place the burden of proof on the employer and explain its application:

> It may be a defense to a charge of discrimination by an individual claiming coverage under the 'regarded as' prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) 'transitory and minor.' To establish this defense, a covered entity must demonstrate that the impairment is both 'transitory' and 'minor." Whether the impairment at issue is or would be 'transitory and minor' is to be determined objectively. A covered entity may not defeat 'regarded as' coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. For purposes of this section, 'transitory' is defined as lasting or expected to last six months or less.

29 C.F.R. § 1630.15(f).

Based on the regulations, this Court has previously concluded that the employer must prove as a defense that the impairment was transitory and minor. *Dube*, 2011 WL 4017959, at *2. The Fifth Circuit has cited this Court's later opinion in *Dube* with approval, and has clearly stated that the plaintiff "need only show that her employer perceived her as having an

impairment." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015); *see also Cannon v. Jacobs Field Servs. N.A.*, 813 F.3d 586, 591 (5th Cir. 2016); *Dube v. Tex. Health & Human Servs. Comm'n*, No. SA-11-CV-354, 2012 WL 2397566, at *3 (W.D. Tex. June 25, 2012).[13]

Citing *Willis v. Noble Environmental Power, LLC*, 143 F. Supp. 3d 475, 484 (N.D. Tex. 2015), CPS Energy argues that the fact that Mesa testified that he fully recovered from his shoulder injury within eight days, with no limitations in his mind,[14] means that the short-term nature of his injury defeats his "regarded as" claim as a matter of law. In *Willis*, the plaintiff suffered a medical episode of dehydration and possible heat stroke and had difficulty walking, seeing, and communicating. Afterward, his employer discussed the episode and concerns about plaintiff working on wind turbines, which required the plaintiff to climb in excess of 300 feet and work in extreme temperatures in the summer. The district court granted summary judgment on the plaintiff's actual disability claim because he failed to show that his impairment substantially limited a major life activity. It also granted summary judgment on his "regarded as" claim on the basis that an objective review of the record revealed that the plaintiff's dehydration episode was transitory and minor because the episode lasted only a few hours, and he then received a clean bill of health with no work restrictions.

---

[13] *See also Silk v. Bd. of Trustees Moraine Valley Comm. College*, 795 F.3d 698, 706 (7th Cir. 2015) (the defendant bears the burden of establishing that the impairment was both transitory and minor); *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) ("The ADA regulations list being 'transitory and minor' as a defense to an ADA claim."). *But see Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016) ("Under the ADAAA, for a plaintiff alleging disability discrimination to show that the employer regarded him as having an impairment, the plaintiff must show that (1) he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action."

[14] Mesa depo. at 156-57.

In response, Mesa argues that CPS Energy perceived him as having a substantially limiting impairment[15] because they determined that Mesa posed a potential safety hazard and wanted Mesa to get an MRI. Mesa argues that the correct focus is not whether Mesa's actual injury was mild, but whether Mesa was perceived as and treated as impaired. Mesa's argument is that CPS Energy perceived him to have a continuing substantial impairment, that it suspended and then involuntarily retired him based on that perception, and that the nature of his actual impairment is irrelevant. In reply, CPS Energy argues that Mesa provides no evidence to conclude that anyone associated with CPS Energy regarded Mesa's shoulder injury as anything other than transitory and minor, insofar as no one ever made a comment that they thought he was disabled or would not recover, and he did in fact recover quickly.

The "regarded as" prong requires the individual to establish that he "has been subjected to an action prohibited under this chapter because of an actual or perceived" impairment. 42 U.S.C. § 12101(3)(A). Because it is undisputed that Mesa was not impaired at the time the adverse employment actions were taken, Mesa's claim is that the adverse employment actions were taken because of a perceived impairment. Under the regulations, CPS Energy must demonstrate that the perceived impairment would be both transitory and minor. In other words, when the "regarded as" disabled claim is based on an alleged perceived impairment, the "transitory and minor" inquiry "is not about Plaintiff's actual impairment, but the impairment perceived by his employer." *Davis v. Vt. Dept. of Corrections*, 868 F. Supp. 2d 313, 326 (D. Vt. 2012); *see also Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1329-31 (N.D. Ala. 2014) (regulations did not support defendant's contention that the court should determine whether the actual impairment was transitory and minor instead of whether defendant perceived employee to

---

[15] The Court notes that Mesa cites to pre-ADAAA amendment case law in his reply brief (docket no. 42 at 14), thus incorrectly asserting that a plaintiff must show that the employer regarded him as having a substantially limiting impairment.

suffer from an impairment that was transitory and minor); *Lewis v. Fl. Default Law Group, P.L.*, No. 8:10-cv-1182-T-27EAJ, 2011 WL 4527456 (M.D. Fla. Sept. 16, 2011) ("The 'transitory and minor' exception to the 'regarded as prong' focuses on the perceived impairment itself and not the condition giving rise to such impairment.").

This is illustrated in the EEOC's interpretive guidance as follows:

> [A]n employer that terminated an employee with an objectively "transitory and minor" hand wound, mistakenly believing it to be symptomatic of HIV infection, will nevertheless have "regarded" the employee as an individual with a disability, since the covered entity took a prohibited employment action based on a perceived impairment (HIV infection) that is not "transitory and minor."

29 C.F.R. pt. 1630 App. § 1630.2(l). This example is easy to comprehend and apply because the actual impairment and the perceived impairment are different, and the perceived impairment (HIV) would always be considered objectively not transitory and minor. The concept and analysis are more difficult when the actual impairment and the perceived impairment are of the same nature, as in this case, and when the impairment (shoulder injury) cannot be viewed categorically to determine whether it is objectively transitory and minor.

Thus, even though Mesa had an actual impairment that CPS Energy argues was transitory and minor, the proper standard for his "regarded as" claim in this case is one for a perceived impairment, and the proper inquiry is whether CPS Energy has demonstrated that the perceived impairment (shoulder injury) would be both transitory and minor. Although whether the employer perceived an impairment (and what it was) is necessarily subjective because it looks to the employer's perceptions, the regulations state that whether the perceived impairment would be transitory and minor is evaluated objectively. This means that the relevant inquiry is whether the shoulder injury perceived by CPS Energy to exist would be objectively transitory and minor, not by determining whether CPS Energy subjectively perceived or believed that Mesa's shoulder

injury was transitory and minor. *Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 851 (M.D. Tenn. 2012) (citing 29 C.F.R. § 1630.2(l) App. (2011)); *see also Budhun v. Reading Hosp. & Med. Ctr.*, 765 F. 3d 245, 259 (3d Cir. 2014) ("[T]he relevant inquiry is whether the impairment that the employer perceived is an impairment that is objectively transitory and minor.").

CPS Energy primarily argues that Mesa's actual injury was transitory and minor and that Mesa has presented "no evidence from which [to] conclude that anyone associated with CPS Energy regarded Mesa's shoulder injury as anything other than transitory and minor" or "made a determination he was or would be impaired longer than six months" Docket no. 44 at 2-3. But, as discussed above, neither is the correct focus. In its Reply, CPS Energy addresses Mesa's argument that because decisionmakers viewed him as a potential safety hazard and wanted a fitness-for-duty exam, they regarded him as impaired under the ADA, arguing that its legitimate concerns about Mesa's ability to work and its desire to determine whether he had any work restrictions are insufficient to infer that it regarded him as having an impairment for purposes of the "regarded as" prong. Docket no. 44 at 3. Instead, CPS Energy argues, it "had legitimate reasons to verify Mesa's ability to work safely and to determine whether he had any work restrictions at all." *Id.*

But Mesa does not argue that the fact that CPS Energy wanted him to have a fitness for duty exam alone means that it regarded him as disabled. Mesa points to the fact that decisionmakers wanted him to have an MRI and that they had concerns about his ability to do the job, and to do it safely. The EEOC's Interpretive Guidance states: "[A]n employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled." 29 C.F.R. pt.

1630, App. § 1630.2(l) (2016). Based on this guidance, the Southern District of Illinois district court stated, "it is enough under the 'regarded as' prong to show that an employer took an action because it believed, rightly or wrongly, that [the employee] would be a safety risk." *Equal Employment Opportunity Comm'n v. Amsted Rail Co., Inc.*, 280 F. Supp. 3d 1141, 1150 (S.D. Ill. 2017) (citing 29 C.F.R. pt. 1630, App. § 1630.2(l) (2016)). As an Eleventh Circuit panel recently explained, the Interpretive Guidance reflects the common-sense principle that if an employer takes adverse action because it fears the consequences of the employee's medical condition, it has regarded the employee as disabled. *Lewis v. City of Union City*, 877 F.3d 1000, 1012 (11th Cir. 2017), *vacated on motion for reh'g en banc*, 893 F.3d 1352 (2018).

The ADA is clear that an individual meets the requirement of being regarded as having an impairment if he establishes that he has been subject to a prohibited action because of a perceived physical impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102. The only exception is that set forth in 42 U.S.C. § 12102(3)(B) – impairments that are transitory and minor. Whether the employee actually was a safety risk would be a separate inquiry under the qualification inquiry or the direct threat defense. *Amsted*, 280 F. Supp. 3d at 1150; 29 C.F.R. § 1630.2(l)(3) (establishing that an individual was regarded as having an impairment does not, by itself, establish liability).

The regulations reflect this structure. Section 1630.2(l) states that "[e]xcept as provided in § 1630.15(f) [the transitory and minor defense], an individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity" and "[e]xcept as provided in § 1630.15(f), an individual is 'regarded as having such an impairment' any time a covered entity takes a

prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action." Prohibited actions include placement on involuntary leave, termination, and exclusion for failure to meet a qualification standard. 29 C.F.R. § 1630.2(l)(1).

Thus, whether CPS Energy *rightly* had concerns about Mesa's ability to work or whether it *rightly* required him to get a human performance evaluation are not the proper inquiries for purposes of CPS Energy's motion for summary judgment on Mesa's *prima facie* case, which is based solely on the transitory and minor defense. The proper inquiry is whether, at the time of the adverse action, CPS Energy perceived Mesa to have a physical impairment (a shoulder injury) that, viewed objectively, would be transitory and minor.[16]

---

[16] CPS also argues that this Court should follow "the Fifth Circuit's pre-amendment precedent and other federal courts' post-amendment holdings concerning fitness-for-duty requirements and, based on the record before it, grant summary judgment to CPS Energy on Mesa's 'regarded as' claim." Docket no. 44 at 5. For the pre-amendment Fifth Circuit precedent, it cites *Richardson v. U.S. Postal Service*, 215 F. App'x 326 (5th Cir. 2007), in which the Fifth Circuit noted that the employee's "best evidence that the USPS regarded him as having an impairment that substantially limits a major life activity is the fact that the USPS did not allow him to work," but rejected the regarded-as claim because "an employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish *per se* that the employer regards the employee as having a substantial limitation on his ability to work in general." *Id.* But this analysis still focuses on the pre-ADAAA requirement that the employer regard the employee as having a substantial limitation, which is the exact requirement removed by the ADAAA in 2008. The same is true for *Leach v. Mansfield*, No. H-07-4331, 2010 WL 707382 (S. D. Tex. Feb. 24, 2010), in which the court noted that the plaintiff's perceived or actual inability to perform his specific job did not establish a perceived disability because the plaintiff "must be perceived as being substantially limited in performing a broad range of jobs," and requesting an employee who has made threats to undergo a fitness for duty exam "does not in itself show that the employer perceives the employee to have a substantially limiting impairment." The "substantially limiting impairment" requirement cannot be divorced from this analysis to make it apply to post-ADAAA cases.

For its "post-amendment" holdings from other courts, CPS Energy cites to *Pena v. City of Flushing*, 651 F. App'x 415 (6th Cir. 2016), but as CPS Energy itself acknowledges, this case holds only that an employer's knowledge of an impairment and requiring a fitness-for-duty examination requirement is not a *per se* "regarded as" violation. The court reasoned that, because the ADA permits employers to request fitness-for-duty examinations as long as they are job-related and consistent with business necessity, requesting such an examination does not impose *per se* liability when the employee refuses to take the exam, as the employee in *Pena* did. The *Pena* court further noted that, by refusing to submit to an exam, the employee is precluded from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or too broad in scope. *Id.* Here, Mesa argues that he did not refuse to submit to the exam, that he was willing to submit to the exam, that he was told he could take the exam on Friday, and that he showed up for the exam. In addition, as will be discussed, it appears undisputed that CPS Energy *did* regard Mesa as impaired at least initially, since it prepared a light duty accommodation for him based on the MedClinic restrictions, and the real question is whether CPS continued to view him as having an impairment when it placed him on unpaid leave (and whether that impairment was transitory and minor within the meaning of the ADA). Accordingly, because there is evidence that CPS viewed Mesa as impaired and because it is

Mesa has provided sufficient evidence to raise a fact issue as to whether CPS Energy perceived him to have a physical impairment – a shoulder injury – at the time it placed him on unpaid leave until his stated retirement date. It is undisputed that CPS Energy decisionmakers knew that Mesa had a shoulder injury that required him to be transported to the emergency room by ambulance. CPS Energy received the Texas Workers' Compensation Work Status Report dated September 13 from Texas MedClinic, which included the "employee's description of injury/accident" as "Left Shoulder Sprain" and "work injury diagnosis information" of "left shoulder sprain/strain." Docket no. 41-10. It allowed the "employee to return to work as of 9/13/2016 with the restrictions identified in Part III, which are expected to last through 09/16/2016." Docket no. 41-10. The restrictions were specific to the left hand/wrist and included no climbing, no reaching, no overhead reaching, automatic transmission only, no lifting/carrying, and "must take prescription medication(s)." *Id.* It included "expected follow-up services" of "evaluation by the treating doctor" on September 16. *Id.*

As Castaneda testified, "[t]he employee sustained injuries that required restrictions that were very specific, in addition to prescription medications." Castaneda depo. at 17. To accommodate these restrictions, Harris-Rowland prepared a light duty position offer. Docket no. 41-11. On September 20, Nova Clinic sent a report listing the diagnosis as "Sprain of ligaments of cervical spine" and "Contracture of muscle, LEFT shoulder." This report had no restrictions and stated it was "the last scheduled visit for this problem" and that "no further medical care is

---

disputed whether Mesa was insubordinate in failing to appear for the fitness-for-duty exam, *Pena* is not on point. Similarly, in *Johnson v. Univ. Hospitals Physician Services*, 617 F. App'x 487, 491 (6th Cir. 2015), the employee's "sole evidence that defendant perceived her as disabled is that it referred her to a fitness-for-duty exam." In *Koszuta v. Office Depot, Inc.*, No. 16-C-2679, 2018 WL 1769368 (N.D. Ill. Apr. 12, 2018), the employee also refused to undergo a fitness-for-duty exam. This Court further notes that, despite being recently decided, *Johnson* and *Koszuta* both mistakenly cite the pre-ADAAA definition of "regarded as." Thus, these cases do not help CPS Energy.

anticipated." Docket no. 41-15. This information was relayed to Drennan and Urrutia. Docket no. 41-16.

However, Castaneda testified that, even after they received the second report, there were still concerns about what Mesa's abilities were, to make sure he could do the job. Castaneda depo. at 17, 23. There was discussion about whether Mesa should get an MRI and Castaneda testified that they wanted him to get one. CPS Energy decided that he needed a fitness-for-duty examination "to ensure he was able to do the minimum requirements of the job." Castaneda depo. at 18. Urrutia also testified that they wanted to make sure that Mesa was fit to return to work and did not pose a safety threat. Urrutia depo. at 42. This is some evidence that CPS Energy still viewed Mesa as having a physical impairment after September 20, despite the fact that Mesa was no longer impaired.

In addition, after Mesa did not obtain the fitness for duty evaluation, the conference call participants still "had concerns about his well-being." Castaneda depo. at 20. Although CPS Energy contends that the sole reason for placing Mesa on unpaid leave was his failure to attend the human performance evaluation, Urrutia stated that the decision to put him on unpaid leave was based in part on "the fact that we're concerned about the safety of the employee." Urrutia depo. at 59. Harris-Rowland testified that the failure to attend the evaluation could be viewed as a disciplinary issue (failure to follow instructions) or as a safety issue. Docket no. 43-1 at 140. This is some evidence that CPS Energy continued to view Mesa as impaired, and that it viewed him as impaired at the time it placed him on unpaid leave on or about September 29 or 30, and that its decision was based at least in part on that perception. Thus, a material issue of fact exists as to whether CPS Energy perceived Mesa as having a physical impairment at the time of the adverse employment action.

To obtain summary judgment on its "transitory and minor" defense, CPS Energy must show that there is no genuine dispute of material fact that it perceived Mesa as having a physical impairment (shoulder injury) that was *objectively* transitory and minor. In other words, it must prove as a matter of law that the shoulder injury it perceived Mesa to have, viewed objectively, was transitory (lasting less than six months) *and* minor. *See Gaus v. Norfolk S. Ry. Co.*, No. 09-1698, 2011 WL 4527359, at *17 (W.D. Pa. Sept. 28, 2011).

Some impairments can be categorized as a whole (*i.e.*, categorically) as objectively transitory and minor or not. For example, bipolar disorder, HIV, and alcoholism are, categorically, objectively not transitory and minor, while cuts and short-term illnesses such as a cold or the flu are, categorically, transitory and minor. *See* FED. DISCRIM. LAWS, Disability Discrimination in the Workplace, § 4.12; *Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 851 (M.D. Tenn. 2012); *Lewis v. Fl. Default Law Group*, No. 8:10-cv-1182-T-27EAJ, 2011 WL 4527465, at *6 (M.D. Fl. Sept. 16, 2011) (citing House Judiciary Committee Report that the transitory and minor exception was to exclude individuals who are regarded as having common ailments like the cold or flu to conclude that the flu is objectively transitory and minor); *Valdez v. Minnesota Quarries, Inc.*, No. 12-CV-0801 (PJS/TNL), 2012 WL 6112846, at *3 (D. Minn. Dec. 10, 2012) ("the legislative history cites seasonal flu as the paradigmatic example of a transitory and minor ailment").

Impairments such as physical injuries are difficult to classify categorically because the nature of such injuries varies. The regulations indicate that a physical injury such as a back injury may be minor, but certainly not all back injuries (or other physical injuries) are minor such that they may be treated categorically as minor or not. Some shoulder injuries may be not only more than "transitory and minor," but actually disabling. In *Cannon v. Jacobs Field Servs., N.A.,*

*Inc.*, 813 F.3d 586, 590-91 (5th Cir. 2016), the Fifth Circuit held that a plaintiff with rotator cuff injury that prevented him from lifting his right arm above the shoulder qualified as actually disabled because he was substantially limited in the major life activities of lifting and reaching.

There is no Fifth Circuit guidance defining "minor" impairment. Non-minor cannot require substantially limiting a major life activity, because that requirement was eliminated from "regarded as" coverage. *Willis* states that "[a]n impairment that subsides within a few hours, requires minimal recuperation time and no continuing treatments or restrictions is clearly both transitory and minor." *Willis*, 143 F. Supp. 3d at 484. Another court has stated that "broken bones, generally, are characterized as being 'transitory and minor' for purposes of ADA disability definitions." *Clark v. Boyd Tunica, Inc.*, No. 3:14-cv-00204-MPM-JMV, 2016 WL 853529, at *6 (N.D. Miss. Mar. 1, 2016).

Some district courts have treated injuries similar to Mesa's (or even more substantial) as transitory and minor. In *Quick v. City of Fort Wayne*, No. 1:15-CV-056 JD, 2016 WL 5394457 (N.D. Ind. Sept. 27, 2016), the plaintiff suffered a back injury and argued that the City regarded him as disabled when it terminated him. The district court evaluated whether the impairment was transitory and minor, citing cases holding that when the plaintiff suffers an acute injury and then makes a swift and complete recovery, it is a minor injury. Although the plaintiff alleged that the back injury was extremely painful, the Court noted that he recovered within a month and held that no reasonable juror could conclude that his back injury was other than transitory and minor, precluding recovery under the "regarded as" prong.

In *Weems v. Dallas Independent School District*, 260 F. Supp. 3d 719 (N.D. Tex. 2017), the plaintiff suffered a significant knee injury requiring surgery, the use of a scooter, and eventually the use of a cane. The district court concluded that the plaintiff was not actually

disabled, and also rejected the plaintiff's "regarded as" claim. *Id.* at 730. However, the court's analysis at one point incorrectly focused on whether the defendant "regarded Weems as being disabled" as opposed to whether it regarded him as having an impairment. *Id.* It found the impairment to be transitory and minor because the plaintiff returned to work within days after his surgery, used only two days of leave in the next four months, and had workplace restrictions for only three months. *Id.* This Court questions whether such an impairment – a knee injury requiring surgery, a scooter, use of a cane, and workplace restrictions – is objectively minor.

Even assuming that Mesa's perceived shoulder injury was transitory, CPS Energy has not conclusively shown that it was minor. It is undisputed that the injury resulted in Mesa being transported to the emergency room by ambulance. As Castaneda himself testified, the injury resulted in specific restrictions (no climbing, no reaching, no lifting) and prescription pain medications. There is some evidence that decisionmakers viewed these restrictions and medication requirements as continuing, since they wanted him to get an MRI, and were concerned about whether he could perform the physical demands of his job and whether he posed a safety risk. Thus, there is some evidence that the impairment CPS Energy perceived had restrictions on climbing, reaching, and lifting. In *Cannon*, the Fifth Circuit held that an employer's belief that an applicant's shoulder injury resulted in substantial impairment limiting the ability to lift and reach (which are major life activities) in his right arm (and that was actually disabling), was sufficient for "regarded as" coverage. *Cannon*, 813 F.3d at 586.

Mesa has provided sufficient evidence to raise a fact issue that CPS Energy continued to view him as having a physical impairment that precluded his ability to climb, reach, and/or lift. If such an impairment is sufficient to qualify one as actually disabled, it logically follows that such an impairment is non-minor. At the very least, Mesa has produced some evidence that a

reasonable person could view the perceived shoulder injury as non-minor. Thus, the Court finds that CPS Energy has failed to meet its summary-judgment burden of proving that the impairment was both transitory and minor, and summary judgment on that basis is denied.

(2) legitimate non-discriminatory reason and pretext

CPS Energy also moves for summary judgment on the basis that it has provided a legitimate, non-discriminatory reason for its actions – Mesa's failure to attend a required fitness for duty exam -- and that Mesa has failed to demonstrate pretext. If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Cannon*, 813 F.3d at 590. If the employer meets this burden, then the burden shifts to the plaintiff to establish that the reason provided by the employer is a pretext for discrimination. *Id.* In the summary-judgment context, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext. *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017).[17]

CPS Energy argues that, even if Mesa raised a fact issue about whether Castaneda told Mesa he could appear for the exam on either Thursday or Friday, Mesa does not dispute that the decisionmakers believed in good faith that Mesa failed to appear for the examination on the

---

[17] It does not appear that Mesa is asserting a mixed-motive basis for his ADA discrimination claim, in which he would agree that the Defendant's asserted reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *See Clark v. Boyd Tunica, Inc.*, 665 F. App'x 367, 371 n.4 (5th Cir. 2016). His briefing on the ADA claim focuses solely on casting doubt on whether CPS Energy's asserted reason is untrue. However, he appears to invoke mixed-motives for his FMLA retaliation claim. The Court notes that Defendant has lumped all claims together for purposes of its pretext argument, though it relies upon an ADA case recognizing a mixed-motive alternative for ADA discrimination claims in its briefing. Docket no. 41 at 20 (citing *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016) (citing *EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014), which the Fifth Circuit recognized *Clark* as applying a mixed-motives analysis)). While the Fifth Circuit has recognized a mixed-motives alternative in ADA discrimination cases, it has not decided whether the mixed-motives alternative survived the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009). *Id.* Similarly, it has not decided whether the mixed-motive framework survived *Gross* and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013) in FMLA retaliation claims. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389-90 (5th Cir. 2013); *see also Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016).

mandated date. CPS Energy further asserts that the fact that Mesa did not in fact intend to retire is irrelevant because he never told any of the decisionmakers that he did not want to retire and their decision to retire him on his selected date cannot be construed as false or pretextual. Docket no. 41 at 20-22; Docket no. 44 at 11-13. Alternatively, CPS Energy contends that Mesa can only recover damages up to December because the evidence conclusively shows that he was not forced to retire on December 1 and Mesa has not shown that he was constructively discharged.

Although Mesa's deposition testimony asserts that he felt he was "fired" on October 3, his briefing more accurately reflects that he was subjected to two adverse employment actions – being placed on unpaid leave from October 3 to November 29, 2016, and being terminated (or involuntarily retired). Mesa has presented sufficient evidence to raise a fact issue as to whether he was placed on unpaid leave because he was perceived as impaired. As discussed above, there is some evidence that decisionmakers viewed Mesa's shoulder injury and its resulting restrictions as continuing at the time they reached their decision, since they were concerned about whether he could perform the physical demands of his job and whether he posed a safety risk.

There is also some evidence that he was placed on unpaid leave for this very reason. Lewis's affidavit states that "he was placed on unpaid leave solely because he failed to attend an examination that was required due to conflicting medical releases received." Docket no. 41-23. But Castaneda testified that the participants "had concerns about [Mesa's] well-being." Castaneda depo. at 20. Urrutia testified that the decision was based on "the fact that Mr. Mesa did not show up to his assigned fitness for duty assigned by occupational health, the fact that we're concerned about the safety of the employee, you know, he did submit his retirement, intent to retire on the 20th, so instead of corrective action process we decided to put him on unpaid leave and not interrupt his end – employment until his retirement date that he – he requested."

Urrutia depo. at 59. The safety concern was "[w]e did not know the fitness of the employee for duty." *Id.* at 60. Urrutia also stated, "We were trying to get him back to work, but, first, we had to understand his fitness for duty." Docket no. 43-1 at 117 (Urrutia depo.). Harris-Rowland testified that Mesa was placed on unpaid personal leave because "[t]here was concern about his safety and so he was not returned to his business area." Thus, a reasonable construction of the evidence is that Mesa was not placed on leave as discipline for failing to attend the exam, but because his failure to attend the exam meant that the concerns about his well-being and ability to do the job were not alleviated, and that actions were taken *because* those concerns persisted.

The evidence further demonstrates that the decision of *what* action to take in regard to those continuing concerns was heavily, if not completely, influenced by Mesa's stated intent to retire on December 1. Lewis stated that "[b]ecause this was a unique circumstance, particularly with Mr. Mesa's upcoming retirement on December 1, 2016, CPS Energy's corrective action policy did not apply." Urrutia also testified, "Mesa because he submitted his retirement, circumstances we already discussed about, you know, the inconsistencies [between the two medical releases], we decided that, you know, instead of going through the Corrective Action Policy we – we – we take an unpaid leave approach and let the employee retire without any interruption of his employment. That's why we did that." Docket no. 43-1 at 124-25. Castaneda also stated that they were trying to get him to his retirement date. Castaneda depo. at 20. The evidence therefore shows that the decision to not apply the Corrective Action Policy but instead place him on unpaid leave until December 1 was based on the fact that Mesa had stated his intent to retire that date. Thus, although the form of the action taken and its duration was influenced by the fact that Mesa had stated an intent to retire, the evidence raises a fact issue as to whether that

action was taken in the first place because Mesa was regarded as disabled. Thus, Plaintiff may proceed on his regarded as disabled claim as to his placement on unpaid leave.

However, Mesa fails to raise a material issue of fact on whether he was "involuntarily retired" by CPS Energy because he was regarded as disabled. The evidence is clear that all of the CPS Energy decisionmakers believed that Mesa intended to and wanted to retire on December 1, 2016. The only person who Mesa contends may have known that he did not intend to retire was Drennan, and Mesa has failed to show that Drennan influenced or was involved in the decision to place him on unpaid leave and retire him.

Mesa contends that his September 9 email stating that he intended to retire but needed to talk to his broker to find the best option supports his claim that he did not intend to retire but did want information about available benefits. But Mesa sent an unequivocal email to his direct supervisor, copying employee benefits, on September 20 stating "My Intent to retire is December 1, 2016." This is the procedure for initiating the retirement process on the CPS Energy website. Docket no. 41-31. Thus, as far as the decisionmakers were concerned, Mesa intended to and wanted to retire on December 1. Mesa fails to provide any evidence to cast doubt on the fact that decisionmakers retired him because of his stated intent to retire, even if they were mistaken because Mesa subjectively never intended to retire. Mesa also points to the fact that he sought new full-time work as proof that he did not intend to retire, but even if Mesa never wanted to or intended to retire, there is simply no basis for a reasonable jury to conclude that CPS Energy retired him for any reason other than because he had informed them of his intent to retire.

Although Plaintiff attempts to demonstrate pretext by arguing that CPS Energy has been inconsistent in stating why it acted, who made the decision, what Mesa's status was while on unpaid leave, and whether he was retired, separated, or terminated, his evidence fails to establish

pretext concerning the decision to retire him on December 1. Alleged inconsistencies about who made the decision and confusion about how to classify Mesa during his unpaid leave do not establish pretext as to the reason for the decision to retire Mesa effective December 1.

To demonstrate that Mesa was fired rather than retired, Plaintiff points to Harris-Rowland's September 30 Critical Issues Report statement that a decision was made to separate Mesa, but Mesa was separated on December 1 pursuant to his intent to retire. Plaintiff states that "Defendant told the Texas Workforce Commission that Mr. Mesa had been fired." Docket no. 43 at 19. But the exhibit page he cites is *Mesa*'s answers to questions about why he was fired and who told him he was fired, and contains no statements by Harris-Rowland that Mesa was fired. Docket no. 43-1 at 197 (Ex. 34 at bates no. D-597).[18] Plaintiff notes another page of that exhibit that contains a statement from Harris-Rowland that states, "ON 100316 WE PUT HIM ON UNPAID LEAVE AND LATER TERMINATED HIM FOR NON COMPLIANCE." Docket no. 43-1 at 201 (Ex. 34 at bates no. D-601). Plaintiff notes that Harris-Rowland also provided a document to TWC stating that Mesa was "still employed" while on unpaid leave.

However, Defendants consistently asserted that Mesa remained employed while on unpaid leave and that his employment ended upon his selected retirement date. To the extent that one TWC document may contain a statement by Harris-Rowland after the fact that CPS Energy "terminated" Mesa instead of "separated" or "retired" him, any inconsistency in Defendant's statements concerning the nature of the separation is simply too slim a reed upon which to resist summary judgment, given the overwhelming evidence that CPS Energy decisionmakers retired Mesa on December 1 consistent with his stated intent to retire, which they had no reason to

---

[18] The text is statement 1/6, which is from the "Claimant" on October 4. The next page D-598 is statement 2/6, from Harris-Rowland, but it contains no text or statement, and the index states that the "Issue Type" for the statement is "FIRED." Statement 3/6 from Harris-Rowland contains the following text: "What was the reason for separation from work? FAILED TO COMPLY WITH OUR REQUEST."

question. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (summary judgment may still be appropriate where the evidence creates at most only a weak issue of fact as to whether the employer's reason was untrue).

Thus, the Court finds that Plaintiff has raised a fact issue as to pretext and may proceed on his claim that he was placed on unpaid leave from October 3 to November 29, 2016 because he was regarded as disabled, but he has failed to show pretext and may not proceed on his claim that he was involuntarily retired or fired. Summary judgment on his "regarded as" disabled claim is granted in part and denied in part.

B. <u>Associational Disability – ADA</u>

The ADA defines the term "discriminate against a qualified individual on the basis of disability" as including "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Fifth Circuit has not set forth the elements of an associational disability claim in a published opinion. However, in *Grimes v. Wal-Mart Stores Tex., L.L.C.*, 505 F. App'x 376, 380 & n.1 (5th Cir. 2013), it stated that a *prima facie* case would require the plaintiff to show: (1) the plaintiff was qualified for the job; (2) the plaintiff was subjected to adverse employment action; (3) the employer knew of the employee's disabled relative; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative was a determining factor in the employer's decision. *See also Spencer v. FEI, Inc.*, 725 F. App'x 263 (5th Cir. 2018); *Besser v. Texas General Land Office*, No. A-17-CV-1010-SS, 2018 WL 1353936 at *5 (W.D. Tex. Mar. 15, 2018).

For purposes of the motion, CPS Energy does not contest the first three elements, but contends that there is no evidence to raise a reasonable inference that Mesa's wife's cancer was a determining factor in the decision to place him on unpaid leave or retire him. Plaintiff contends that this Court should find that his wife's disability was a determining factor in CPS Energy's decision because (1) Harris-Rowland stated that Mesa "refused" to go to work on September 16 even though she would receive notification when Mesa was approved for FMLA, (2) Urrutia was suspicious of why Mesa moved the date of his MedClinic visit, and this suspicion "began less than two weeks after his use of FMLA," (3) despite providing notice about his use of FMLA leave and following Defendant's procedures, Mesa's use of time off was viewed as suspicious and "Defendant demonstrated a negative attitude towards his use of that time off," and (4) Defendant's claimed reason is pretext. Docket no. 43 at 26.

The Court finds that Plaintiff fails to establish that his wife's cancer was a determining factor in the decision to place him on unpaid leave and retire him. Mesa's wife was diagnosed in 2013, and Mesa testified that he had no complaints about any events before 2016 and that no one ever mentioned or complained of any associated costs. Plaintiff does not show that any person at CPS made any negative comments or expressed any hostility toward Plaintiff's wife's cancer or his association with his wife. Nor did Defendant deny Plaintiff leave to take care of his wife. Plaintiff relies on Harris-Rowland's comments about Plaintiff's "refusal" to attend work and going to Houston to "have fun" and argues that this and the suspicion over his missed appointment demonstrates a negative attitude toward his use of time off. But Mesa agreed that Harris-Rowland did not know about his wife's condition when she made the comment about going to Houston to "have fun," and he had experienced no prior alleged negative effects despite his absences to care for his wife over a period of three-and-half years.

The evidence shows that Defendants were confused about whether Mesa was supposed to be at work on September 16 and why Mesa rescheduled his MedClinic appointment and went to Nova Clinic, but this does not tend to demonstrate that Mesa's wife's cancer played a role in the adverse employment actions. Although Mesa testified that Harris-Rowland was upset that Mesa would not be coming in to accept the bona fide light duty employment offer as she had planned and she stated that Mesa refused to go to work to accept the offer, nothing indicates that any negative comments, perceptions, feelings, or actions were in any way "because of" Mesa's wife's cancer. At most, Mesa has shown that Harris-Rowland was upset that Mesa was taking leave rather than coming to work to accept her light duty offer, and under these circumstances, that is properly addressed in Mesa's FMLA claim, not his disability association claim. The circumstances do not raise a plausible inference that his wife's disability was a determining factor in the decision to place him on unpaid leave or retire him. Consequently, summary judgment is granted on this claim.

### III.     Retaliation under the Family Medical Leave Act

Mesa brings a claim for retaliation under the FMLA, alleging that CPS Energy retaliated against him for using FMLA benefits to care for his wife. Docket no. 43 at 23-25. The FMLA prohibits retaliation for the exercise of FMLA rights, including exercising the right to reasonable leave for medical reasons. *Ray v. United Parcel Serv.*, 587 F. App'x 182, 186-87 (5th Cir. 2014). The *McDonnell-Douglas* burden-shifting framework applies to FMLA retaliation claims when the claim is based on circumstantial evidence.

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) a causal link exists between his protected activity and the adverse action. *Wheat v.*

*Florida ParishJuvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016); *Mauder v. Metro. Transit Auth. of Harris Cty.*, 446 F.3d 574, 583 (5th Cir. 2006). If the plaintiff satisfies the initial burden, the burden shifts to the defendant to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action. If the employer articulates such a reason, then the burden shifts to the plaintiff to prove by a preponderance of the evidence that the employer's reason is pretextual.[19]

Defendant argues that Plaintiff cannot establish a *prima facie* case of FMLA retaliation because he cannot show that he was treated less favorably than an employee who had not requested leave under the FMLA or that Defendant took the adverse action because he took FMLA leave. Docket no. 41 at 16. Plaintiff has not attempted to show that he was treated less favorably than an employee who did not request leave under the FMLA. Thus, the issue is whether he has established a *prima facie* case that he was placed on unpaid leave or retired because he took FMLA leave.

"When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave and the termination." *Mauder v. Met. Transit Auth. of Harris Cty., Tex.*, 446 F.3d 547, 551 (5th Cir. 2006). Close proximity in time between FMLA leave and the adverse action may establish a minimal causal connection sufficient to carry Plaintiff's burden. *Clark v. Southwest Airlines Co.*, No. 1:16-CV-910-RP, 2017 WL 4853794, *5 (W.D. Tex. Oct. 26 2017); *Garcia v. Penske*

---

[19] As noted, Mesa appears to invoke a mixed-motive analysis for his FMLA retaliation claim in which retaliatory animus was a motivating factor in an adverse employment action. The Fifth Circuit has not decided whether the mixed-motive analysis may still be applied. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389-90 (5th Cir. 2013); *see also Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016). Neither party addresses this issue, but both cite *Mauder v. Metro. Transit Auth. of Harris Cty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). Defendant lumps all of the claims together in its pretext argument, without distinguishing among the various claims, but cites *Delaval v. P Tech Drilling Tubulars, LLC*, 824 F.3d 476 (5th Cir. 2016) for the causation standard, which is an ADA case applying a motivating factor test (*i.e.*, mixed motives).

*Logistics, LLC*, 165 F. Supp. 3d 542, 559 (S.D. Tex. 2014). CPS Energy placed Mesa on unpaid leave shortly after Plaintiff had requested and obtained FMLA leave to care for his wife.

In addition, Mesa argues that Harris-Rowland was hostile to his use of FMLA leave and presents evidence that, despite knowing he took FMLA leave on September 16 to take his wife to the doctor in Houston, she sent an email and wrote that he "refused" to report to work that day to accept the bona fide offer. Harris-Rowland was involved in the meeting that led to the decision to place Mesa on unpaid leave. The evidence is sufficient to show that Mesa's use of FMLA leave and the adverse employment action were not completely unrelated. *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 766 (5th Cir. 2016) (citing *Mauder v. Metro. Transit Auth. of Harris Cty.*, 446 F.3d 574, 583 (5th Cir. 2006)).

CPS Energy's motion for summary judgment on Plaintiff's *prima facie* case of FMLA retaliation based on Mesa's placement on unpaid leave is denied. However, for the same reasons discussed with regard to the ADA claim, summary judgment is granted on Mesa's claims related to his alleged involuntary retirement because there is no reasonable basis from which to conclude that Mesa's taking FMLA leave played any role in CPS Energy retiring him on December 1, 2016.

CPS Energy further contends that summary judgment is appropriate because it has proffered a legitimate, nondiscriminatory reason for placing Mesa on unpaid leave and Mesa has failed to demonstrate pretext. Defendant's asserted reason for placing Mesa on unpaid leave was his failure to attend the human performance evaluation. However, Mesa has produced evidence that he had no prior disciplinary infractions and that, if viewed as a disciplinary violation, lesser sanctions under the Corrective Action Policy, including a short suspension, might have been applicable, but the Corrective Action Policy was not applied. Instead, decisionmakers placed him

on eight weeks of unpaid leave, allegedly for missing the appointment, without even knowing why he missed the appointment. When an employer opts to have a disciplinary system that involves lesser sanctions, the employer's failure to follow that system may give rise to inferences of pretext. *Goudeau*, 793 F.3d at 477.

The temporal link between Mesa's use of leave, Harris-Rowland's hostility to his leave and her participation in the decision, and the failure to apply a disciplinary system is sufficient to survive summary judgment on Mesa's FMLA retaliation claim related to the unpaid leave. At summary judgment, evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination even without further evidence of defendant's true motive. *Goudeau*, 793 F.3d at 476; *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016). Summary judgment is granted on the FMLA retaliation claim based on the alleged termination, and denied as to placement on unpaid leave.

## IV.     Age Discrimination under the ADEA

Under the ADEA, it is unlawful to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To make a claim for age discrimination, Plaintiff must first establish a *prima facie* case of age discrimination. *Goudeau v. Nat'l Oilwell Varco*, *L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). To establish a *prima facie* claim under the ADEA related to a discharge, Plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of his age. *Id.*

Plaintiff has failed to raise a material fact issue that he was discharged. As noted by CPS Energy, if he had been discharged, he would not be receiving full retirement benefits. However, even if the retirement is sufficient to establish discharge, he fails to show that he was "otherwise discharged because of his age." As noted, there is no basis in the evidence to conclude that CPS Energy decisionmakers retired him on December 1 due to age discrimination. Though the fact that Mesa's eligibility for retirement was correlated somewhat with his age (Mesa argues that an employee must be over age 40 to be retirement eligible), that does not render the decision made "because of" age.[20]

All of the objective evidence indicates that CPS Energy decisionmakers believed that Mesa intended to and wanted to retire on December 1, 2016. Mesa admitted that he never told anyone at any time that he did not want to retire or attempt to rescind his intent to retire. It may very well be true that Mesa never intended to retire and felt he had been fired on October 3 and thus felt it was pointless to attempt to argue that he did not want to retire. But that subjective belief is not enough to establish that CPS Energy discriminated against him because of his age when it retired him, as he had informed them he wished to do. There is simply no basis to reasonably conclude that CPS Energy discriminated against him on the basis of age when it retired him on December 1.

---

[20] Nor has he rebutted CPS Energy's argument that he was not replaced by someone younger because the person who filled his position was already a Control Room Operator at a different power plant. CPS Energy asserts that it has not hired anyone to fill Mesa's position since his unpaid leave and retirement. The employee that Mesa testified that Drennan wanted to replace him with was already a control room operator at another power plant. This employee is younger than Mesa but is over age 40, and was moved to the Leon Green power plant in January 2017. CPS argues that his relocation does not qualify as a "replacement" that satisfies the fourth element of Mesa's *prima facie* case, citing *Mack v. John L. Wortham & Son, L.P.*, 541 F. App'x 348, 359 (5th Cir. 2013) for the proposition that the plaintiff was not replaced by another employee already employed with the employer and *Sellers v. BNSF Ry. Co.*, No. 1:11-CV-190, 2013 WL 1181458, at *11 (E.D. Tex. Mar. 18, 2013) for the proposition that reassignment or absorption of a terminated employee's job duties does not constitute "replacement" for purposes of the prima facie case. Mesa does not respond to this argument, and the Court assumes that Mesa is not proceeding on a theory that he was replaced by someone younger.

Defendant also moves for summary judgment on the unpaid leave, arguing that Mesa cannot establish the fourth element of the *prima facie* case – that he was placed on an unpaid leave of absence in October because of his age. Defendant notes that Mesa testified that "no one with CPS Energy ever said anything to [Plaintiff] that he thought was negative about his age," nor could he "identify a single person with CPS Energy whom he believes discriminated against him on account of his age." Docket no. 41 at 19 (citing Mesa depo. at 46, 68). Defendant argues that he has nothing other than his own general, unsupported, and speculative belief. *Id.*

Mesa attempts to establish a *prima facie* case of age discrimination based on his placement on unpaid leave on October 3. Mesa argues that "the adverse actions taken against [him], including not applying the disciplinary policy, were done because he was retirement eligible," pointing to Urrutia's testimony that Mesa's retirement status was considered in the decision to place him on unpaid leave, and it was the reason they did not use the normal disciplinary corrective action policy. Plaintiff argues that Defendant discriminated against him because of his age "because age and retirement are inexorably linked." Docket no. 43 at 22.

However, as CPS Energy notes, Mesa improperly argues that he was discriminated against because he was "retirement eligible." Although retirement eligibility alone is generally insufficient to prove age discrimination, *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995), age discrimination may occur when pension status serves as a proxy for age, as in the case cited by Mesa, *Hilde v. Cityof Eveleth*, 777 F.3d 998, 1006 (8th Cir. 2015). However, the evidence here is that Mesa had expressed his intent to retire, not that he was simply eligible to retire. The fact that he could retire in part due to his age does not mean that CPS Energy's decision based on Mesa's stated intent to retire was because of his age. The Fifth Circuit has

noted that "[t]here is a link between retirement and age, but it is not a necessary one." *Martin v. Bayland, Inc.*, 181 F. App'x 422 (5th Cir. 2006).

In addition, the Supreme Court has noted that, "as a matter of pure logic, age and pension status remain 'analytically distinct' concepts." *Ky. Retirement Sys. v. E.E.O.C.*, 554 U.S. 135, 143 (2008). The Court explained that "one can easily conceive of decisions that are actually made 'because of' pension status and not age, even where pension status is itself based on age." *Id.* When the employer's decision is wholly motivated by a factor other than age, age discrimination has not occurred, even if the motivating factor is correlated with age, as pension status typically is. *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). The undisputed evidence shows that Mesa was treated differently because he had stated an intent to retire in the near future, not because he was retirement-eligible or because of his age. Thus, Mesa fails to establish a claim for age discrimination and summary judgment is granted on this claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket no. 41) is GRANTED IN PART. Plaintiff's claims under the Rehabilitation Act are DISMISSED WITH PREJUDICE. Plaintiff's claims under the ADEA are DISMISSED WITH PREJUDICE. Plaintiff's claims under the ADA based on his own disability and based on association with his disabled wife are DISMISSED WITH PREJUDICE. Plaintiff's FMLA retaliation claim based on use of leave for his own medical condition is DISMISSED WITH PREJUDICE.

The Court DENIES summary judgment as to Plaintiff's claim for "regarded as" disability discrimination and FMLA retaliation for use of leave to care for his wife as to the unpaid leave adverse employment action, but GRANTS summary judgment on these claims as to the alleged discharge adverse employment action. Thus, the only remaining claims are Plaintiff's ADA

"regarded as" claim and his FMLA retaliation claim related to being placed on unpaid leave (October 3 through November 29, 2016).

It is so ORDERED.

SIGNED this 16th day of August, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE